UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILSON RIVERA,

    Plaintiff,

v.                                                                              Case No. 1:14-cv-214
                                                                                              Hon. Robert J. Jonker

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.
    _____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983.  This matter is now before the Court on a motion for summary judgment filed by the two remaining defendants Chaplain Leroy White and mail room clerk Deanne Stephens (docket no. 77).

    **I.**    **Background**

Plaintiff Wilson Rivera is incarcerated by the Michigan Department of Corrections (MDOC).  In this lawsuit, he sued the MDOC and the following MDOC employees:  Director Daniel Heyns, Deputy Director Tom Finco, CFA Special Activities Coordinator Michael Martin, Chaplain Leroy D. White, Mail Room Clerk D. Stephens, and Regional Prison Administrator Ray Wolfe.  Compl. (ECF No. 1).  In addition, plaintiff sued the Chaplaincy Advisory Council (CAC) and the CAC members "who recommended" the denial of his constitutional, federal and state law rights.  *Id*. at PageID.14.  Finally, plaintiff named Robert Jones Bey, Grand Sheik of the Moorish Science Temple of America, Inc., located in Washington, D.C.  *Id*. at PageID.6.

In his lawsuit, plaintiff alleged that he and other prisoners are "Moorish American Moslems" of the "Moorish Science Temple of America-1928 Grand Body/Moorish Divine National Movement" (MSTA-1928). On December 15, 2012, plaintiff and other prisoners presented to each defendant a formal request for recognition of MSTA-1928 as a religious group, in accordance with MDOC Policy Directive 05.03.150 ["Religious Beliefs and Practices of Prisoners"]. In addition, plaintiff the other prisoners requested the right to practice their religion in the following ways:

> [T]o hold a Holy Day (Friday Moorish Jummah), Wednesday Moorish Koranic Class Study Group and Sunday School Class meetings, to receive our required and requested religious materials, emblems, Moorish Islamic Mohammedan Charms, Circle Seven Charms, Star and Crescent charms, Moorish Islamic prayer rugs, Moorish Dikr beads for prayer and meditation and reflection, Moorish Kuffee, Moorish American flag pins, Prophet Badge, religious wedding (obligation) bands, Moorish prayer oil (Attar), Moorish Ramadan (fasting) from October 1st through October 31st every year same dates and time, in Honor of our Great Prophet Ali of America; [to] be allowed to enroll into our University of the Moorish Science Temple of America–1928 (UMSTA) unmolested and receive any study lessons and booklets, video lessons from our Spiritual Guides and Teaches, our Grand Governors/Governess and Governors, Sheiks and Sheikesses, audio tapes, DVD's, and books approved by the [MSTA-1928] and representation from our National Leadership, from Our Supreme Grand Sheik, Dr. Ra Saadi El, Shaykh (Chief of Ministers), and all whom he and our Supreme Grand Body appoints, anoints, and consecrates . . . .

Compl. at PageID.16. Plaintiff alleged that defendants failed or refused to respond to the requests.

Plaintiff also alleged that because MSTA-1928 was not recognized by the MDOC, he is required to worship with a different Moorish American group, "Moorish Science Temple of America, Inc., (1934 Portion)" (hereinafter "MSTA-1934"). Compl. at PageID.17. According to plaintiff, MSTA-1928 disagrees with MSTA-1934 on issues of religious doctrine and practice, and that "if we practice our faith in the MSTA 1934 group services, there will be a conflict." *Id*. at PageID.19.

Relevant to this motion are plaintiff's claims that mail room clerk Stephens directed mail room staff to reject religious materials that plaintiff received in December 2012 and May 2013. *Id*. at PageID.21-22. Plaintiff also alleged that Chaplain White directed mail room staff to reject materials sent to plaintiff from his religious organization and refused to process plaintiff's book order for religious books. *Id*. at PageID.22. Plaintiff also alleged that Chaplain White threatened or intimidated him because plaintiff refused to "tear up" a religious preference form. *Id*. While plaintiff's complaint did not allege the dates that these occurred, plaintiff alleged that he filed a grievance regarding the book order on December 21, 2012, and that he filed a grievance regarding the alleged intimidation on December 24, 2012. *Id*.

The Court previously noted that plaintiff's claims involved alleged violations of his rights under the First, Eighth and Fourteenth Amendments to the Constitution, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1 *et seq.*] and Michigan state law. *See* Opinion (ECF No. 5, PageID.133); Order (ECF No. 6). The Court ordered service on the remainder of the claims on defendants MDOC, Heyns, Finco, Martin, White, Stephens, Wolfe and the CAC. *Id.* All of the remaining defendants were served except for the CAC. The Court granted summary judgment to defendants MDOC, Heyns, Finco, Martin, White, Stephens, and Wolfe as to all of plaintiff's claims except: (1) that Ms. Stephens rejected plaintiff's incoming mail on December 10, 2012; (2) that Chaplain White improperly advised mailroom staff to reject plaintiff's incoming mail in December 2012; (3) that Chaplain White refused to sign plaintiff's disbursement form to order a religious book; and (4) that Chaplain White attempted to intimidate plaintiff into tearing up his religious preference form indicating membership in MSTA-1928. *See* Order (ECF No. 35).

3

## II. Plaintiff's claim against the CAC

Since filing this action on March 5, 2014, plaintiff has not pursued any claims against defendant CAC in the past three years. Because plaintiff has abandoned his claim against CAC, this defendant should be dismissed for lack of prosecution.[1]

## III. Summary judgment

### A. Legal standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

---

[1] This report serves as plaintiff's notice pursuant to W.D. Mich. LCivR 41.1.

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. RLUIPA claim

Defendants contend that RLUIPA provides no basis for relief because the injunctive relief requested under that statute is directed against non-party MDOC, i.e., that the MDOC "recognize MSTA-1928 as a separate religious group and to allow members of that group to practice their faith in a distinct manner" and that "the MDOC to create a specific meal plan consistent with Plaintiff's religious practices." *See* Compl. at PageID.29-31. In his response, plaintiff acknowledges that he can only receive injunctive relief under RLUIPA, that the MDOC has been dismissed from this action, and "that any and all claims against the MDOC or any other defendant apart from White and Stephens, is moot." *See* Plaintiff's Response (ECF No. 87, PageID.455). Plaintiff's remaining claims are for monetary damages against Chaplain White and Ms. Stephens. Accordingly, defendants' motion for summary judgment should be granted as to the RLUIPA claim.

### C. First Amendment claims

#### 1. Legal standard

Plaintiff's remaining claims are brought pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff

5

must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff's § 1983 claims against Chaplain White and Ms. Stephens arise under the First Amendment, which provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). The Supreme Court has recognized that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted), and that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty," *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). In addition, it is clearly established that prisoners retain their First Amendment right to receive mail. *See Winburn v. Bologna*, 979 F. Supp. 531, 536 (W.D. Mich. 1997).

However, these retained rights are not without limitation. While prisoners must be provided "reasonable opportunities" to exercise their religious freedom under the First Amendment, *Hudson v. Palmer*, 468 U.S. 517, 523 (1984), limitations on the exercise of First Amendment rights "arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone*, 482 U.S. at 348 (internal citations and quotation marks omitted). In balancing these considerations, the evaluation

of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination. *Id.* at 349.

Similarly, "[a] prisoner's right to receive mail is subject to prison policies and regulations that are 'reasonably related to legitimate penological interests,' *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), such as 'security, good order, or discipline of the institution.' *Thornburgh v. Abbott*, 490 U.S. 401, 404, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005). In the volatile prison environment, prison officials must be given broad discretion to prevent disorder caused by incoming mail which could circulate throughout the prison's population. *See Thornburgh*, 490 U.S. at 413.

Here, Chaplain White and Ms. Stephens contend that plaintiff's claims against them are barred by the affirmative defense of qualified immunity. Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The dispositive question is whether the violative nature of the particular conduct at issue in the lawsuit is clearly established. *See Mullenix v. Luna*, -- U.S. --, 136 S. Ct. 305, 308 (2015). "A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Carroll v. Carman*, -- U.S. --, 135 S. Ct. 348, 350 (2014). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Thus, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll*, 135 S. Ct. at 350.

When a defendant raises the issue of qualified immunity on summary judgment, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Although the plaintiff bears the ultimate burden, "[t]he defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.* Once this is accomplished, "the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id.* To meet his burden on summary judgment, a plaintiff must show (1) that a constitutional right was violated, and (2) that the right was clearly established at the time of the violation. *Chappell v. City Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). The court may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009).

> **2. Plaintiff's claims that defendants violated his constitutional rights by rejecting mail and denying a request for a religious book.**

In his supporting affidavit, Chaplain White stated that on November 2, 2012, he received a package of religious material from mailroom clerk Stephens addressed to plaintiff, which contained literature from "Moorish Science Temple of America (MSTA) 1928." White Aff. (ECF No. 78-4, PageID.410). After reviewing the literature, he contacted MDOC Special Activities Coordinator (SAC) Michael Martin (now retired) for advice on how to proceed. *Id*. Chaplain Martin instructed Chaplain White to reject any literature related to MSTA-1928, and referred White

8

to a memorandum outlining the problems and disruptions that other MDOC facilities have encountered with this organization. *Id*.

In an email dated November 2, 2012, SAC Martin advised Chaplain White that MSTA-1928 was not an approved MDOC religious vendor and that White "may need to say no more than that." *See* Martin email (ECF No. 78-3, PageID.404). Martin continued:

> The MDOC recognizes only the MSTA religion for religious services. If the paraphernalia is intended to be personal religious property, it should not have come to you, but to the prisoner(s) for whom it was intended.
>
> The MSTA-1928 Portion has tried several times in the past at other facilities (DRF in particular) to send in personal religious property items that are not approved. The personal religious property items were not approved by the Department.
>
> The facilities have rejected the items and the vendor informed of the reason for the rejection. The vendor persists. It would seem that they don't understand our rules, or intentionally try to circumvent them. I've attached a memo that I wrote awhile ago that outlines problems encountered with the 1928 Portion of the MSTA. It may give some helpful background.

*Id*.

In his memo, SAC Martin pointed that while the MDOC approves religions to hold group meetings within the MDOC, it does not permit various sects of a religion to hold separate services. Martin Memorandum (ECF No. 78-3, PageID.406). Martin noted that there are various sects of the Moorish Science Temple of America including: The Moorish Science Temple of America, Inc., The Moorish Science Temple of America (Reincarnated), The Moorish Science Temple of America (1928 Portion) a/k/a the Moorish Divine National Movement, and others. *Id*. Martin recounted that MSTA-1928's request for recognition was denied in May 2006. *Id*. Despite this denial, "The MSTA 1928 Outreach Prison Ministry Program" has attempted to send unauthorized religious property to the MDOC since 2008. *Id*.

9

On April 16, 2009, SAC Martin denied a proposal from a prisoner affiliated with MSTA-1928 to hold a seminar at a correctional facility featuring guest speakers from the organization. Martin supported this decision by pointing out that in its writings, MSTA-1928 "makes exclusive claims about itself with respect to the Moorish Science Temple of America, Inc.," e.g., that "[t]he MSTA 1934 are living up to a 79 year old lie," and presents a prison security risk:

> F. The MSTA 1928 Portion grants titles and rank to MDOC prisoners and places them in position of authority over other members of this religion. (letter to incarcerated members, April, 2008)
>
> G. These prisoner leaders are granted authority to approve or disapprove fellow prisoners for membership. (March 22, 2008 letter to Bates El.)
>
> H. The MSTA 1928 Portion requires members to pay dues and levies fines for late payment of dues and arriving late at a meeting. (p. 4, Your Moorish Islamic Community Newsletter).

Martin Memo at PageID.407.

SAC Martin further stated:

> [I]t is my conclusion that the MSTA 1928 Portion is an exclusive religious group that claims to be the only true MSTA organization. It is highly critical of the MSTA Inc. or 1934 group with whom the MDOC has traditionally worked. With the leadership of the national organization it appears that they have established a clandestine religious organization within the MDOC.
>
> The national organization has twice attempted to violate MDOC property and religious beliefs and practices policies by sending to a prisoner unapproved religious property as an unapproved vendor. I believe it would invite conflict within our facilities to permit MDOC 1928 Portion representatives to speak inside our facilities. It is my conclusion that some of the policies and activities encouraged by the national organization may pose a threat to the safety and security of the MDOC. I suggest that the activities of this religion within the MDOC be further investigated.
>
> Finally, while the MSTA 1928 Portion's organ, "Mother is Calling" self publishes, I recommend that all packages and letters from the organization be closely

>  scrutinized. I do not recommend that this organization or its publisher/online store be approved by any facility as a vendor.

*Id*.

Based on this information, Chaplain White instructed Ms. Stephens to reject the package of religious material sent to plaintiff pursuant to MDOC Policy Directive 05.03.118, "Mail that is a threat to the security, good order, or discipline of the facility." White Aff. at PageID.410. *See* Notice of Rejection (stating that the mailed material was rejected on December 14, 2012 pursuant to MDOC Policy Directive 05.03.118) (ECF No. 1-1, PageID.41).[2] With respect to plaintiff's related claim regarding the book order, Chaplain White stated that he did not sign plaintiff's request to purchase MSTA-1928 documents from the publisher, "Mother is Calling Production," because the latter was not an authorized vendor and that, per instructions from SAC Martin, he could not authorize the request. White Aff. at PageID.412.

Plaintiff has failed to meet his burden of showing that Chaplain White and Ms. Stephens violated his clearly established constitutional rights with respect to either the rejected mail or the book order. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (internal brackets and quotation marks omitted). In making this determination, courts "do not require a case directly on point," however "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. At the time Chaplain White and Ms.

---

[2] Plaintiff has also included a Notice of Rejection on May 1, 2013 which was also pursuant to MDOC Policy Directive 05.03.118. *See* Notice of Rejection (ECF No. 1-1 at PageID. 68). However, this claim is not before the Court. *See* Order (ECF No. 35).

Stephens made these decisions, the legal status of MSTA-1928 as a separately recognized religion from MSTA-1934, and MDOC prisoners' right to obtain religious books and materials specific to MSTA-1928, were not clearly established. On the contrary, these issues were being litigated in this Court months after the incidents occurred. *See, e.g., Jack-Bey v. Michigan Department of Corrections*, 1:13-cv-131 (W.D. Mich.) (Opinion) (June 20, 2013) (Order) (June 21, 2013) (ECF Nos. 7 and 9) (Court ordered service of prisoner's complaint which sought recognition of MSTA-1928 as separate religion from MSTA-1934 and prisoner's right to possess MSTA-1928 materials).

Plaintiff has presented evidence that some months after Chaplain White and Ms. Stephens made these decisions, the MDOC apparently clarified its position with respect to MSTA-1928. *See* SAC Martin e-mail (May 16, 2013) (ECF No. 87-4, PageID.497-498).[3] While these emails indicate that the MDOC may have changed its policy with respect to MSTA-1928 in May 2013, Chaplain White and Ms. Stephens were complying with MDOC policy when they acted in December 2012.

---

[3] Martin's e-mail reads in pertinent part:

> Members of the Moorish Science Temple of America who are followers of the MSTA-1928 may attend currently scheduled MSTA services. They may purchase and possess approved religious property for members of the MSTA religion; they may receive clergy visits from MSTA-1928 clergy.
>
> They may also purchase and possess MSTA-1928 literature that conforms to the requirements of MDOC Prisoner Mail policy. Like other such purchases, MSTA-1928 literature must be purchased either from the publisher if the publisher agrees to collect and remit Michigan sales tax, or from an approved vendor that agrees to collect and remit Michigan sales tax.

Martin e-mail (May 16, 2013) (ECF No. 87-4, PageID.497-498).

Finally, plaintiff contends that Chaplain White is not entitled to qualified immunity because White improperly relied on SAC Martin's instructions. Plaintiff cites *Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010), in which the Sixth Circuit rejected a police officer's qualified immunity claim because the officer stated that he was following the orders of the municipal agent in charge of the premises. In rejecting the officer's claim, the Court stated that "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order" and that "under the Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy." *Kennedy*, 595 F.3d at 337 (internal quotation marks and brackets omitted). Contrary to plaintiff's claim, the record reflects that Chaplain White was not 'just following orders." Rather, the record reflects that Chaplain White made his own decisions with respect to rejecting the mail and denying plaintiff's request for the religious book.

In summary, plaintiff has not met his burden with respect to defendants' qualified immunity claims involving the rejected mail and the denial of the book request. Defendants made reasonable judgments in performing their discretionary functions which did not violate plaintiff's clearly established statutory or constitutional rights. *See Carroll*, 135 S. Ct. at 350 (2014); *Harlow*, 457 U.S. at 818. Accordingly, Chaplain White and Ms. Stephens are entitled to summary judgment on these claims.

> **b.    Plaintiff's claim that Chaplain White attempted to intimidate plaintiff into tearing up his religious preference form changing his religious affiliation to MSTA - 1928**

During the week of December 16, 2012, Chaplain White received seven or eight prisoner requests to change religious preference to MSTA-1928, one of which was from plaintiff. White Aff. at PageID.411. Due to the number of requests and security concerns, Chaplain White contacted SAC Martin, who advised him about disruptions at other facilities involving MSTA-1928. *Id*. Martin advised Chaplain White to try to explain to the prisoners that the requested change could not be made on the Offender Management Network Information (OMNI) System because the MSTA-1928 was not a religion recognized by the MDOC. *Id*. In his affidavit, Chaplain White explained that the MDOC uses the OMNI system to enter the religious preference of each prisoner, that the system allows for 29 different religious preferences, that MSTA-1928 is not a religion recognized by the MDOC, and that "[i]f the MDOC does not recognize a religion, a CSJ-177 form requesting to change religious preferences would be impossible to approve and enter into the system." *Id*. In addition, Chaplain White was concerned because seven of these prisoners were going to the MSTA-1934 callout later in the week and "that problems between the two groups would result in violence or another altercation." *Id*.

On or about December 21, 2012, Chaplain White met with plaintiff regarding plaintiff's written request to officially change his religion preference to MSTA-1928. *Id*. at PageID.411-412. At that time, White tried to inform plaintiff that his request was not valid. *Id*. at PageID.411. According to White, he told plaintiff, "[Y]ou might as well tear that up, because this is not a valid request. The MSTA-1928 portion is not recognized by the MDOC and there is no way

14

to enter your request into the OTIS [sic] System." *Id*. at PageID.411-412.  White stated that he was not attempting to coerce or scare plaintiff, but was only attempting to advise him of the impossibility of his request based on the instructions received from SAC Martin.  *Id*. at PageID.412.

Plaintiff has failed to meet his burden with respect to his claim that Chaplain White "intimidated" him by suggesting that he tear up his religious preference form.  First, White's statements did not violate plaintiff's constitutional rights.  *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) (verbal abuse, harassment, and threats do not rise to the level of a constitutional violation under § 1983).

Second, even if the Court construed plaintiff's claim as implicating a constitutional right, e.g., that Chaplain White interfered with plaintiff's free exercise of his religious beliefs by suggesting that plaintiff tear up his religious preference request, plaintiff's claim fails.  It is undisputed that MSTA-1928 was not a religion recognized by the MDOC and that plaintiff's request to have his religious preference changed to MSTA-1928 could not be entered into the religious preference system.  Plaintiff disputes this, citing a December 21, 2012 e-mail from Chaplain White to SAC Martin, which indicates that Chaplain White could have entered plaintiff's religious preference under the designation "other faiths."  *See* Chaplain White e-mail (ECF No. 87-4, PageID.496) ("I have received seven (7) prisoner requests on MDOC Declaration of Religious Preference forms to change their preference to "The Moorish Science Temple of America - 1928 Portion."  How should I proceed?  Should I make them "other faiths?").  While a factual question may exist with respect to whether Chaplain White could have entered plaintiff's religious preference under the designation of an "other faith," this was not what plaintiff asked him to do. Rather, plaintiff wanted the chaplain to change his religious preference to "MSTA-1928."  Based on this

record, Chaplain White's actions did not interfere with or prevent plaintiff from exercising his religious beliefs.

Finally, while plaintiff contends that Chaplain White should have retained the form because plaintiff signed it pursuant to MDOC Policy Directive 05.03.150 ¶ R,[4] this alleged policy violation relating to the retention of a document did not violate plaintiff's federal constitutional rights. An MDOC employee's alleged failure to comply with a state policy or rule "does not itself rise to the level of a constitutional violation." *Norris v. Straub*, No. 1:05-cv-771, 2005 WL 3479849 at *4 (W.D. Mich. Dec. 20, 2005), citing *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir.1992). *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995) (42 U.S.C. § 1983 remedies violations of federal law, not state law).

In summary, Chaplain White did not violate plaintiff's federal constitutional rights when he told plaintiff that he might was well "tear up" his religious preference form for a religion which plaintiff knew was not recognized by the MDOC. Accordingly, Chaplain White is entitled to summary judgment on this claim.

---

[4] MDOC Policy Directive 05.03.150 ¶ R (eff. 9/15/2015) provides that:

Each prisoner shall be allowed to identify his/her religious affiliation, but will not be recognized as belonging to, or allowed to participate in the services or activities of, more than one religious group at any given time. Prisoners may change their religious affiliation no more often than twice a year and must provide written notice of the change to the institutional Chaplain. The Declaration of Religious Preference form (CSJ-177) shall be used to identify and change religious affiliation. The form shall not be retained in any of the prisoner's commitment files, unless requested in writing by the prisoner. Except in SAI ["Special Alternative Incarceration Program" for probationers], the Warden shall ensure that the prisoner's religious affiliation as identified on the Declaration of Religious Preference form is entered on the Department's computerized database within five business days after receipt of the form by the Chaplain.

## V. Recommendation

For these reasons, I respectfully recommend that defendants White and Stephens' motion for summary judgment (docket no. 77) be **GRANTED**, that plaintiff's claim against the Chaplain's Advisory Council be dismissed for lack of prosecution, and that this action be **TERMINATED**.

Dated: July 13, 2017          /s/ Ray Kent
                              RAY KENT
                              United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).